WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark A. Finney, et al., | No. CV-12-01249-PHX-JAT |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| First Tennessee Bank, et al., | |
| Defendants. | |

From February 3, 2016, to February 4, 2016, the Court presided over the bench trial in this matter. Plaintiffs Mark A. Finney ("Finney") and the Conlon Group Arizona, LLC ("Conlon") allege that Defendants First Tennessee Bank ("First Tennessee"), Nationstar Mortgage, LLC ("Nationstar"), and Bank of New York Mellon (collectively the "Defendants") breached the implied covenant of good faith and fair dealing when Defendants refused to consider a loan modification for three investment properties that Plaintiffs refinanced through First Tennessee's predecessor. The Court hereby finds and concludes the following.

### I.   Findings of Fact

The parties, collectively, proffered two witnesses at trial. Mark A. Finney testified on behalf of Plaintiffs. (Doc. 59). Keith Kovalic, a litigation resolution analyst with Nationstar, testified on behalf of Defendants. (Doc. 61). The Court finds both witnesses to be credible. The following findings are derived from their credible testimony at trial

and documentary evidence submitted into the record.

Finney testified, and the Court accepts as true, that he is resident of St. Louis, Missouri, and that he is the president and primary shareholder of Conlon Group, Inc., a Missouri corporation, which is the parent company of Conlon, a Missouri limited liability company. In 2003, after Finney visited the Arizona Biltmore Hotel Villas and Condominiums (the "Biltmore"), Conlon[1] purchased three Biltmore properties (the "Units") to rent out as a conservative, long-range investment.[2] First Horizon Home Loan Corporation ("First Horizon"), a Kansas corporation, provided financing for Conlon's purchase in 2003.

In 2004, Conlon joined the Biltmore board,[3] and was ultimately elected president of the board in 2005. While president, Conlon undertook a series of board-authorized actions to protect property values at the Biltmore. These actions brought Conlon into direct conflict with the Biltmore's ownership group.[4] Pertinent to the pending matter, Conlon sued the Biltmore's owners to obtain an accounting of the Biltmore's "rental pool agreement"[5] revenue after Conlon discovered a discrepancy in the revenue that it was

---

[1] While Finny undertook all of the actions that form the basis of the Court's findings, he did so as president and primary shareholder of Conlon. For clarity and consistency, the Court refers to "Conlon" as the actor throughout the Order.

[2] The record is unclear as to whether any of the Units were purchased by Finney in his personal capacity. But from 2003 to 2004, Finney—either in his personal capacity or acting on behalf of Conlon—purchased six units at the Biltmore. The Units at issue in this matter—three properties—were purchased by Conlon.

[3] The record fails to discern with clarity what exactly the Biltmore board was, and in what capacity it functioned. Testimony at trial made clear that it was a separate entity than the Biltmore's ownership group.

[4] The record does not establish what entities held a controlling interest in the Biltmore from 2007 until it filed for bankruptcy in February 2011. This information is not necessary for adjudication of the matter.

[5] The rental pool is a system where individuals who own unoccupied units at the Biltmore place them into a "pool" that the Biltmore rents out each night to guests. The revenue generated from the pool is divided evenly among the participants. It creates a

owed. Conlon was ultimately successful in litigating this matter.

In the spring of 2007, faced with the possibility of further litigation with the Biltmore's owners, Conlon sought to refinance the Units to establish a litigation fund. Conlon returned to First Horizon, the lender that initially financed the Units. First Horizon informed Conlon that it would refinance the Units, but mandated that Conlon first deed the Units to Finney. The loans would then be obtained in Finney's name, and Finney could subsequently deed the Units back to Conlon, subject to First Horizon's mortgage. Conlon viewed select loan documents prior to closing, but did not view them in their entirety. Conlon never had a conversation about loan modification with First Horizon, Conlon's legal counsel or the broker prior to execution of the deeds. Conlon relied on the advice provided by counsel, and concluded that First Horizon made the most competitive refinancing offer.

On April 7, 2007, Conlon deeded the Units to Finney via quit claim deed. On April 9, 2007, Finney refinanced the loans for the Units with loans from First Horizon, and executed three separate notes secured by three deeds of trust (the "Deeds of Trust") with First Horizon. Each Deed of Trust contained a "Family Rider" that deleted Section 6—which required owner occupancy of the property—and established the assignment of rents to the lender. There was no discussion between Conlon and First Horizon as to whether Finney would occupy the properties; First Horizon understood that the Units would be non-owner-occupied units. Each Deed of Trust also contained the following section:

> **12. Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.

---

revenue stream for the individual unit owner.

- 3 -

> Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in accounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

(Doc. 37-2 at 46).

After executing the Deeds of Trust, on May 15, 2007, Finney deeded the Units back to Conlon. The refinance loans—originated by First Horizon—were subsequently transferred and sold into a securitized trust that was managed by Bank of New York Mellon in May 2007. First Horizon was thereafter merged into its parent, First Tennessee; Conlon ultimately made its mortgage payments to First Tennessee from June 1, 2007, to June 1, 2011.

Between 2007 and 2009, agent Fred Shapiro ("Shapiro")[6] came to Conlon with a number of "pocket listings"[7] for a possible sale of the Units. No pocket listing pertaining specifically to one of the Units was ever presented to Conlon and Shapiro never showed the Units to a prospective buyer. Each time Shapiro approached Conlon, Conlon declined the "pocket listing" and instructed Shapiro not to proceed.

In February 2011, the Biltmore's ownership filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Southern District of New York. Conlon, concerned with the effect that the bankruptcy might have on the value of the Units and the Biltmore rental pool in general, actively sought to protect its interests. Conlon hired counsel, worked for the formation of an unsecured creditors' committee,

---

[6] Finney's credible testimony at trial described Fred Shapiro as a real estate agent responsible for approximately 80-90% of all Biltmore unit sales.

[7] "Pocket listings" are verbal offers relayed from Shapiro to an owner of a unit at the Biltmore. Pocket listings are utilized by owners who may have an interest in selling their unit, but are reluctant to formally announce their intentions and have an agent list the unit and conduct formal showings for prospective buyers. The record is unclear as to exactly how many times Shapiro presented Conlon with pocket listings. In 2007, Shapiro came to Conlon with between two and five listings. Shapiro also approached Conlon in 2009 an unknown number of times.

- 4 -

and agreed to chair it. Prior to June 1, 2011,[8] Conlon contacted First Tennessee to discuss the possibility of a loan modification in light of the threat bankruptcy posed to the Units' value and the expected cost of litigation to protect the Units. First Tennessee informed Conlon that it would no longer be servicing Conlon's loans, and that Nationstar would be the new servicer. First Tennessee further informed Conlon that it should wait 120 days before contacting Nationstar so that transfer of the loans would be complete. On August 15, 2011, Nationstar became the new servicer for Conlon's loans.

After transfer from First Tennessee to Nationstar was complete, Conlon contacted Nationstar on numerous occasions to inquire as to whether loan modification for the Units was possible. Each time, Conlon was informed that Nationstar would not consider loan modification because the units were investment properties and the properties were not owner-occupied. Nationstar further informed Conlon that the reason it would not consider modification was due to the fact that the trust that owned the pool of mortgages that Conlon's loans were sold into prohibited modification. Nationstar, as a third-party servicer, was required to follow the governing trust.

On September 27, 2011, Nationstar informed Conlon (via letter to Finney) that the Units were in default. Conlon subsequently contacted a number of lenders between 2011 and 2013 in an attempt to refinance. Conlon's overtures never materialized due to the negative impact the defaults had on its credit rating. Plaintiffs retained counsel in an attempt to discuss loan modification substantively with Nationstar, but were rebuffed. On June 11, 2012, Plaintiffs filed suit.

The foregoing findings of fact are based on documentary evidence submitted into the record and credible testimony at trial on February 3 and February 4, 2016.

## II.     Analysis and Conclusions of Law

---

[8] The record does not establish the exact date Conlon contacted First Tennessee to discuss loan modification. June 1, 2011, is the date of the last mortgage payment made by Conlon on the Units.

- 5 -

Plaintiffs' remaining operative claim is for breach of the implied covenant of good faith and fair dealing. (Doc. 20 at 4-5). Plaintiffs allege that Defendants are liable for breaching the implied covenant for refusing to discuss with Plaintiffs the possibility of a loan modification for the Units. Plaintiffs contend that based on the loan documents and the behavior of the parties to the agreement, Plaintiffs had a reasonable expectation that Defendants would consider in good faith a loan modification for the Units.[9]

"Damages are an essential element of a claim for breach of the implied covenant of good faith and fair dealing." *White v. AKDHC*, *LLC*, 664 F. Supp. 2d 1054, 1065 (D. Ariz. 2009) (citing *United Dairymen of Arizona v. Schugg*, 128 P.3d 756, 762 (Ariz. Ct. App. 2006)); *see also Wells Fargo Bank v. Ariz. Laborers*, *Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 29 (Ariz. 2002) (noting that a "[b]reach

---

[9] Defendants have maintained throughout this matter that Conlon lacks standing to assert the claim brought in the Complaint. (Doc. 37 at 12). Standing is a "constitutional prerequisite growing out of Article III's 'case or controversy' requirement," Aikins v. St. Helena Hosp., 834 F. Supp. 1329, 1333 (N.D. Cal. 1994) (citing U.S. CONST. art. I, § 2, cl. 1.), and the Court must address it first. At the summary judgment stage, the Court denied summary judgment on the issue of Conlon's standing, (Doc. 42 at 7-8), noting that although Plaintiffs offered "no evidence in support" of their assertion that "Conlon is an assignee of Finney's rights under the Deed of Trust," nonetheless "a genuine issue of material fact may exist" with respect to whether Conlon has standing. (Id. at 8).

At trial, Defendants again brought up the issue of standing, but did not offer any cases or specific evidence to support their lack of standing argument. The only evidence in the record on this point is that Finney deeded the Conlon group the properties and Finney did not assign the Deeds of Trust to the Conlon group; there is no evidence regarding whether the notes were assigned to Conlon.  Finney testified that both he and Conlon had expectations under the contract originally and suffered the damages Plaintiffs have attempted to establish. Defendants' evidence that Finney never assigned the Deeds of Trust or notes to Conlon is not supported by any Arizona law that Finney had the legal capacity to assign the Deeds of Trust, which were in reality assets of the lender (as evidenced by the fact that the lender assigned them without Finney's consent). Moreover, the testimony at trial was that Finney advised the lender of his intent (and the lender acquiesced) to transfer the properties back to Conlon after the loan funded. Accordingly, Defendants have failed to refute Plaintiffs' allegations that Conlon had standing to sue under this contract as either an intended third party beneficiary or as the alter ego of Finney.

of the implied covenant may provide the basis for imposing damages"). "Although tort damages may be sought where there exists a special relationship between the parties, 'the remedy for breach of this implied covenant is ordinarily by action on the contract.'"[10] *Sw. Sav. & Loan Ass'n v. SunAmp Sys.*, 838 P.2d 1314, 1318 (Ariz. Ct. App. 1992) (citation omitted).

Plaintiffs ask the court to award $526,000 in damages for Defendants alleged breach of the implied covenant. Plaintiffs do not state whether they seek actual or consequential damages for their injury. Accordingly, the Court will consider both. Common law definitions for "actual" and "consequential" damages apply, as the Uniform Commercial Code ("UCC") "does not govern liens on real property." *Hogan v. Wash. Mut. Bank, N.A.*, 277 P.3d 781, 783 (Ariz. 2012) (citation omitted). Actual damages are those that are "in satisfaction of, or in recompense for, loss or injury sustained," or "such compensation or damages for an injury as follow from the nature and character of the act, [that] will put the injured party in the position which he was in before he was injured." *State v. Morris*, 839 P.2d 434, 437 (Ariz. Ct. App. 1992) (citation omitted) (borrowing the civil definition for application to criminal restitution). Such damages "must be provable to a reasonable certainty," *Corrigan v. Scottsdale*, 720 P.2d 513, 519 (Ariz. 1986), and cannot be "speculative, remote or uncertain." *Lewin v. Miller Wagner & Co.*, 725 P.2d 736, 741 (Ariz. Ct. App. 1986) (citation omitted).

Plaintiffs contend that they were injured by Defendants' breach on two occasions. The first injury occurred in 2007, when Conlon refinanced the Units with First Horizon. Plaintiffs argue that if Defendants had been forthcoming about their investor property policy at that time, then Plaintiffs would have sold the Units at that point. Finney testified that at this time, Plaintiffs had $2,000,000 in equity in the Units prior to refinancing with First Horizon. But, Plaintiffs concluded that $526,000 was an appropriate measure of

---

[10] "When the remedy for breach of the covenant sounds in contract, it is not necessary for the complaining party to establish a special relationship." *Wells Fargo Bank*, 38 P.3d at 29 (citing *Firstar Metro. Bank & Trust v. Federal Deposit Ins. Corp.*, 964 F. Supp. 1353, 1358 (D. Ariz. 1997)).

damages due to apportionment of risk and responsibility between the parties to the loan. Plaintiffs also assert that they were injured in 2009, when Plaintiffs became actively involved in the Biltmore's bankruptcy. Finney further testified that if Plaintiffs had been aware of Defendants' investor property policy at that time, then Plaintiffs would have sold the Units at that point and paid off the mortgages. Plaintiffs assert that if they had sold the Units in 2009, then they would have realized profits[11] of $526,000 from the sales.

The Court notes, again, that it finds Mr. Finney to be a sincere and credible witness. Nonetheless, even assuming that Defendants breached the implied covenant of good faith and fair dealing by failing to consider a loan modification, the Court concludes that Plaintiffs have failed to establish to a reasonable certainty that they suffered damages flowing from a breach. It is undisputed that Plaintiffs came to an agreement with First Horizon to refinance the Units in April 2007. Accepting Finney's testimony as true, Conlon proactively contacted First Tennessee[12] between January 1, 2011, and May 31, 2011, to request a loan modification in light of the threat that the Biltmore's bankruptcy posed to the value of the Units. Conlon was then told to wait 120 days before contacting Nationstar, the new loan servicer. When Conlon contacted Nationstar, it was informed that it was ineligible for loan modification due to the fact that the Units were investment properties. "A breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." *Snow v. Western Sav. & Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986) (citation omitted); *see also* Restatement (Second) of Contracts § 235(2) (noting that breach is "[w]hen performance of a duty under a contract is due" and "any non-performance" occurs). The alleged breach occurred at this point in time. Plaintiffs proffered testimony that they were injured—respectively—in 2007 and 2009, well before the alleged breach is to have occurred. Damages must "flow

---

[11] Lost profits may be recovered as a form of consequential damages. *Flagstaff Affordable Hous. L.P. v. Design Alliance, Inc.*, 223 P.3d 664, 667 (Ariz. 2010).

[12] As noted *supra*, First Horizon merged with First Tennessee in May 2007.

- 8 -

from a breach of contract," *McAlister v. Citybank (Arizona)*, 829 P.2d 1253, 1257 (Ariz. Ct. App. 1992) (citations omitted), and the record before the Court is bereft of evidence that Plaintiffs were injured as a result of a breach in 2011.

Moreover, Plaintiffs have failed to proffer persuasive argument or authority to support the theory that damages may precede a breach of the implied covenant. Plaintiffs argue that First Horizon's decision to withhold from Plaintiffs information about its discretionary loan modification parameters prior to the April 2007 refinancing deprived Plaintiffs of the ability to make an informed and intelligent decision. But this argument speaks to an alleged wrong that induced Plaintiffs to select First Horizon to refinance the Units. Rather than demonstrating that Plaintiffs were injured based on Defendants' breach, it suggests that Defendants withheld material information to secure Plaintiffs' acceptance of the offer in 2007. Based on the evidence of record, the Court cannot say that the alleged injuries suffered in 2007 and 2009 "follow from the nature and character of the act" complained about, *Morris*, 839 P.2d at 437, and the damages suffered have not been proven "to a reasonable certainty." *Corrigan*, 720 P.2d at 519. Thus, Plaintiffs have failed to establish that actual damages were incurred.

Plaintiffs fare no better under an analysis for consequential damages. "Consequential damages are those reasonably foreseeable losses that flow from a breach of contract." *McAlister*, 829 P.2d at 1257 (citations omitted). They must be "proximately caused" by breach of the implied covenant. *Standard Chtd. PLC v. Price Waterhouse*, 945 P.2d 317, 347 (Ariz. Ct. App. 1996) (citation omitted); *see also Seekings v. Jimmy GMC, Inc.*, 638 P.2d 210, 215 (Ariz. 1981) (noting that consequential damages "are those damages caused by a breach of contract . . . that can reasonably be supposed to be within the contemplation of the parties at the time of the contracting"). Again, Plaintiffs have failed to show that the lost profits from a hypothetical sale of the Units in 2009 are "reasonably foreseeable losses that flow from [the] breach of contract." *McAlister*, 829 P.2d at 1257 (citations omitted). As discussed *supra*, the evidence establishes that Plaintiffs' alleged damages occurred prior to the alleged breach. Absent persuasive

argument and authority to the contrary, the Court cannot conclude that an alleged breach of the implied covenant that occurred in 2011—when Plaintiffs sought a loan modification from First Tennessee and Nationstar—could cause "reasonably foreseeable" damages two years prior. Plaintiffs have similarly failed to establish that consequential damages were incurred.

The Court has concluded that Plaintiffs have failed to carry their burden and establish damages, an "essential element" of the claim. *White*, 664 F. Supp. 2d at 1065 (citation omitted). In light of this conclusion, the Court need not reach the question of whether Defendants' actions constitute a breach of the implied covenant of good faith and fair dealing. *See Rhoades v. Avon Products*, *Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007) (noting that federal courts may only entertain actual cases or controversies; otherwise, a judgment would "become an unconstitutional advisory opinion"). Judgment shall be entered in favor of Defendants.

### III. Judgment

Based on the foregoing,

**IT IS ORDERED** that the Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiffs.

**IT IS FURTHER ORDERED** that Defendants' oral Motion for Judgment as a Matter of Law, (Doc. 57), is denied as moot.

Dated this 3rd day of March, 2016.

James A. Teilborg
Senior United States District Judge